Herbert M. COLLINS, et al., Plaintiffs,

v.

**CITY OF NORFOLK, et al.,**
**Defendants.**

**Civ. A. No. 83–526–N.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Feb. 3, 1988.

James F. Gay, Norfolk, Va., Frank R. Parker, William L. Robinson and Patricia M. Hanrahan, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for plaintiffs.

Philip R. Trapani, City Atty., Harold P. Juren, Deputy City Atty., Alan M. Salsbury, Asst. City Atty., Norfolk, Va., R. Harvey Chappell, Jr. and Paul W. Jacobs, II, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., for defendants.

## ORDER

CLARKE, District Judge.

This case is before the Court on remand from the Fourth Circuit Court of Appeals. Plaintiffs, Herbert M. Collins; Dr. H. Marks S. Richard; Barbara C. Parham; William E. Swindell, Jr.; Dr. Milton A. Reid; George Banks; Julian Hazel; and the Norfolk Branch of the National Association for the Advancement of Colored People (NAACP) sued defendants, the City of Norfolk, Virginia; the Norfolk City Council; City Council members Vincent J. Thomas, Joseph A. Leafe, Dr. Mason C. Andrews, the Reverend Joseph N. Green, Jr., Claude J. Staylor, Jr., Robert E. Summers and Elizabeth M. Howell; the City of Norfolk Electoral Board; and Electoral Board members Paul D. Fraim, Martha H. Boone, and Paul M. Lipkin, alleging that Norfolk's at-large system of electing City Council members improperly diluted black voting strength in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution, Amended Section 2 et seq. of the Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq., and 42 U.S.C. § 1983.

## I. STATEMENT OF THE CASE

The following facts were found by this Court at the original trial and were not disputed on appeal. Plaintiffs, except for the Norfolk NAACP, are black registered voters of the City of Norfolk. Plaintiffs Collins, Reid and Banks, and plaintiffs' attorney James F. Gay are unsuccessful candidates for election to the Norfolk City Council; Collins and Gay were endorsed in their unsuccessful campaigns by plaintiff Dr. Milton Reid, publisher of the newspaper, *The Journal and Guide*. They were not, however, endorsed by the Concerned Citizens of Norfolk (CCN), the then dominant black political organization in Norfolk. Plaintiff Swindell is an unsuccessful candidate for the House of Delegates from Norfolk. Plaintiffs Collins, Richard, Parham and plaintiffs' attorney Gay are former Norfolk City Democratic Committee members who were removed from their positions shortly before filing the instant action.

This Court entered judgment for the defendants, *Collins v. City of Norfolk*, 605 F.Supp. 377 (E.D.Va.1984), holding that plaintiffs had failed to prove their claims under the Fourteenth and Fifteenth Amendments and Section 1983, and further holding that plaintiffs had failed to establish their vote dilution claim under the Voting Rights Act, Section 2 as amended, 42 U.S.C. § 1973.

The Fourth Circuit affirmed. *Collins v. City of Norfolk*, 768 F.2d 572 (4th Cir. 1985). Plaintiffs petitioned the United States Supreme Court for a Writ of Certiorari. One week after its decision in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court, without considering the merits of the case, remanded *Collins* to the Fourth Circuit "for further consideration in light

of *Thornburg v. Gingles.*" *Collins v. City of Norfolk,* — U.S. —, 106 S.Ct. 3326, 92 L.Ed.2d 733 (1986). The Fourth Circuit remanded the case to this Court for reconsideration of the issues of racial polarization, minority electoral success, candidate slating, and government responsiveness in the East Ghent redevelopment. *Collins v. City of Norfolk,* 816 F.2d 932 (4th Cir. 1987).

Plaintiffs did not appeal the disposition of their constitutional and Section 1983 claims, and these matters are therefore no longer before this Court. Plaintiffs now seek a declaratory judgment that the at-large system of electing Norfolk's City Council members unlawfully dilutes black voting strength; an injunction prohibiting the holding of future City Council elections under the at-large system; and the replacement of the at-large system with a system of wards or single-member districts. Except for the issues enumerated here and discussed below, this Court's findings in 605 F.Supp. 377 were unchallenged or were affirmed on appeal, and are therefore the settled law of the case.

### A. Issues to be Determined on Remand

On remand, this Court must reconsider the following factors in light of *Thornburg v. Gingles:*

1. Whether analysis of the voting patterns of black and white voters over a period of years reveals legally significant racially polarized voting in the Norfolk City Council elections. 816 F.2d at 936 and 936 n. 3.

2. Whether black electoral success in Norfolk has been so consistent (and nearly proportional) as to overshadow any racially polarized voting and other factors tending to dilute minority access. 816 F.2d at 937.

3. Whether the success of a second black candidate in 1984, after the filing of this lawsuit, resulted from unusual circumstances, such as an attempt by white officials to forestall Voting Rights Act litigation. 816 F.2d at 938.

4. Whether any group of white citizens involved in the Norfolk City Council elec-

tions acted as a formal or informal slating organization, controlling access to the ballot, and adversely affecting black citizens' access to the electoral process. 816 F.2d at 939.

5. Whether the removal of mostly black, low-income families from the East Ghent area of Norfolk was unresponsive to the needs of the minority community. 816 F.2d at 939.

### B. Settled Factual and Legal Issues

The following findings of this Court were not designated for consideration on remand, are now the law of the case, and will not be reconsidered here:

1. Despite past acts of official discrimination, Norfolk's black citizens today participate in the electoral process equally with white citizens, and have higher registration and turnout rates than do whites. The procedures and facilities of the Registrar's Office are fair and are equally accessible to all of Norfolk's citizens. 605 F.Supp. at 385.

2. Norfolk has no unusually large election districts, majority vote requirements, anti-single shot provisions or other voting practices or procedures that might enhance the opportunity for discrimination against the minority group. 605 F.Supp. at 389–90.

3. Norfolk's black citizens are not hindered in their participation in the electoral process by socio-economic disparities in such areas as education, employment and health. 605 F.Supp. at 392.

4. Norfolk's political campaigns have not been characterized by either subtle or overt racial appeals. 605 F.Supp. at 393.

5. The at-large system in effect in Norfolk and in a large majority of other cities in Virginia is not the result of a tenuous state or local policy. 605 F.Supp. at 399.

Both plaintiffs and defendants having submitted briefs and memoranda, and oral argument having been heard on the matter, this case is now ready for determination.

For the reasons set forth below, the Court finds that the voting patterns in Norfolk do not reflect legally significant racial-

ly polarized bloc voting within the *Gingles* standard; that Norfolk's black voters have usually been able to elect their preferred candidates; that black electoral success in Norfolk has been so consistent and nearly proportional as to preclude a finding of vote dilution under Section 2 of the Voting Rights Act and to overshadow any racially polarized voting and other factors, if those factors had been found; that the success in 1984 of a second black candidate after the filing of this lawsuit did not result from unusual circumstances or from any action or inaction by white officials or political leaders tending to forestall Voting Rights Act litigation; that no group of white citizens involved in the Norfolk City Council elections acted as a formal or informal slating organization; that no such group controlled access to the ballot or adversely affected black citizens' access to the electoral process; and that the East Ghent relocation process was not unresponsive to the needs of the minority community. This Court therefore finds for the defendants on all grounds. All facts found in 605 F.Supp. 377 and not disturbed on appeal are considered as established facts in this opinion.

## II. DISCUSSION OF ISSUES ON REMAND

Much of the evidence overlaps between issues in this case. For the sake of clarity, the Court will not follow the sequence of issues on remand, but will arrange its discussion of issues by topic.

### A. The 1982 Amendments to Section 2 Of The Voting Rights Act

Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, prohibits any voting practice or procedure "imposed or applied ... in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color...." A violation of this Section "is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election ... are not equally open to participation by members of a [protected] class of citizens ... in that

its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." See *Thornburg v. Gingles*, 106 S.Ct. at 2759.

### B. The Senate Report Factors

■ The Senate Report, S.Rep. No. 417, 97th Cong., 2d Sess. 2, *reprinted in 1982 U.S.Code Cong. & Ad.News* 177, 179 [the Senate Report] which accompanied the bill amending Section 2, "espouses a flexible, fact-intensive test for § 2 violations." *Gingles*, 106 S.Ct. at 2764. At-large voting is not a *per se* violation of the Act, and the Act explicitly denies that any group is entitled to proportional representation. While the Senate Report provides that "[t]he extent to which members of a protected class have been elected to office" is one circumstance to be considered, the Report also provides specifically "[t]hat nothing in this Section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 106 S.Ct. at 2759–60.

■ Proof of discriminatory intent is not required to establish a violation of Section 2. Rather than provide a hard and fast test, the Senate Report enumerates the following "typical factors," derived from *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and from the Fifth Circuit's opinion in *Zimmer v. McKeithen*, 485 F.2d 1297 (1973), *aff'd sub nom East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam):

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that

may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles,* 106 S.Ct. at 2759–60 and 2759 n. 4 (quoting S.Rep. at 28–29). A court must assess the impact of a contested structure or practice "on the basis of objective factors," such as the Senate Report factors. *Id.* at 2759–60 (citing S.Rep. at 27, 1982 U.S.Code Cong. & Ad.News pp. 177, 205). However, it is not necessary that a certain number (or even a majority) of factors point one way or another. S.Rep. at 29, 1982 U.S.Code Cong. & Ad.News p. 177.

### C. *Gingles v. Edmisten and Thornburg v. Gingles*

*Gingles v. Edmisten,* 590 F.Supp. 345 (E.D.N.C.1984) *rev'd in part and aff'd in part sub nom Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), establishes the standard for interpreting Section 2 and the Senate Report factors. In *Gingles,* black North Carolina voters sued various North Carolina officials, claiming that North Carolina's legislative districting scheme resulted in impermissible vote dilution and violated their rights under the Fourteenth Amendment to the United States Constitution, and under Amended Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. Specifically, the *Gingles* plaintiffs alleged that the plan submerged black voting minorities in multi-member House Districts 36, 39, 23, 21 and 8; and multi-member Senate District 22. They further alleged that the plan fractured a geographical concentration of blacks between more than one Senate District, including Senate District 2, so that there was no effective voting majority of black citizens in any one district. 590 F.Supp. at 349–50.

The *Gingles* three-judge district court relied on the Senate Report factors in determining the statutory claims, applying the "totality of the circumstances" test set forth in Section 2(b). It found that the North Carolina redistricting plan violated Section 2 by diluting the black citizens' vote in all seven of the challenged districts. 590 F.Supp. at 376. *See also* 106 S.Ct. at 2760. The Supreme Court affirmed as to six of the districts, but a plurality of six Justices writing in three opinions reversed as to House District 23. Although the district court had found violations of all but one of the Senate Report factors in that District, persistent black electoral success in District 23 precluded the plaintiffs from prevailing in that district. The plurality establishes that proportional representation bars a Section 2 claim. However, nothing in *Gingles* creates an entitlement to proportional representation, or establishes less-than-proportional representation as proof of a violation.

A comparison of the application of the Senate Report factors in *Gingles* and in *Collins* will therefore be instructive.

### 1. Lingering Effects of Past Official Discrimination and Discriminatory Voting Practices

The *Gingles* district court found a long history of official discrimination in North

Carolina's State Senate and House elections, with poll taxes, numbered-seat plans and anti-single shot provisions in effect into the late 1960's. As late as 1970, a literacy test requiring black voters to read and write the Constitution was in effect in some North Carolina districts. 590 F.Supp. at 359–60. Since 1915, North Carolina had had a majority vote requirement for primaries, making it less likely that minority-preferred candidates could finally win elections. 590 F.Supp. at 363. As a result of this official discrimination, the district court found that, at the time of trial, "black voter registration remains depressed relative to that of the white majority," *id.* at 361, and that lingering effects of discrimination in facilities, education, employment, housing and health care continued to hinder North Carolina's black voters in their ability to participate effectively in the political process. *Id.* The court also found that the percentage of black registered voters in North Carolina was far below the percentage of blacks in the population. *Id.* at 357.

In Norfolk, by contrast, there is no majority vote requirement. Black voters exceed white voters in registration and turnout rates. 605 F.Supp. at 385. Despite an early history of discrimination against blacks in Virginia, there are no lingering effects of discrimination in facilities, education, employment and health care affecting their ability to participate in the electoral process. *Id.* at 392. Norfolk's black citizens today participate in the electoral process equally with white citizens, and the procedures and facilities of the Registrar's Office are fair and equally accessible to all of Norfolk's citizens. *Id.* at 385. Norfolk has had no discriminatory voting practices at any time relevant to this litigation. *Id.* at 389–90.

### 2. Overt or Subtle Racial Appeals

Appeals to racial prejudice were prevalent in North Carolina's elections at the time of trial, and had been widespread and persistent for the past thirty years. 590 F.Supp. at 364. Some racial appeals by candidates and supporters were overt and blatant, while others were more subtle and furtive. *Id.* However, the specific examples of racial appeals in the North Carolina elections "reveal an unmistakable intention by their disseminators to exploit existing fears and prejudices and to create new fears and prejudices on the part of white citizens in regard to black citizens and to black citizens' participation in the political processes of the state." *Id.*

No such racial appeals were present in the Norfolk City elections. 605 F.Supp. at 392–93.

### 3. Whether the State's Policy is Tenuous

The Supreme Court found the policy behind the North Carolina plan to be tenuous. The policy behind Norfolk's at-large election system is not tenuous.

The *Gingles* redistricting plan, unlike the Norfolk at-large election plan, was put into place after the Voting Rights Act was passed. 590 F.Supp. at 350. The policy behind the original North Carolina plan was that no county should be divided, in accordance with the North Carolina Constitution. However, the revised redistricting plan at issue in *Gingles* divided some counties. *Id.* at 351. In that case, where North Carolina had already abandoned the "no-division-of-counties" policy for some of the districts, any policy against dividing the remaining counties was clearly tenuous. "[S]uch a policy obviously could not be drawn upon to justify, under a fairness test, districting which results in racial vote dilution." *Id.* at 373–74. Norfolk's policy, on the other hand, "is consistent with both national and state practices for cities with the council-manager form of government" and is not the product of a tenuous policy. 605 F.Supp. at 399.

### 4. Legally Significant Racially Polarized Voting Under the Gingles Standard

Although all of the Senate Report factors are important, the *Gingles* district court identified as the "linchpin of vote dilution by districting" a pattern of racial bloc voting consisting of

[t]he demonstrable unwillingness of substantial numbers of racial majority to vote for any minority race candidate or any candidate identified with minority race interests.

590 F.Supp. at 355 (citations omitted). The mere existence of an at-large plan, and the mere fact that blacks are a minority in a given multi-member district does not establish that vote dilution has resulted from the districting plan. *Id.* Nor is a showing that blacks are a voting or population minority in a multi-member district, nor a showing that "blacks have not been elected ... in numbers proportional to their population" sufficient to establish a violation. *Id.*

While all of the Senate Report factors "may be relevant to a claim of vote dilution through submergence in multi-member districts, *unless there is a conjunction of the following circumstances*, the use of multi-member districts generally *will not impede the ability of minority voters to elect representatives of their choice.*" 106 S.Ct. at 2765–66 (emphasis added) (footnote omitted).

The *sine qua non* of a plaintiff's Section 2 vote dilution claim, as set forth in *Gingles*, is that "a bloc voting majority must *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group." *Id.* at 2766 (emphasis in original) (citations omitted). It is "the usual predictability of the majority's success [that] distinguishes structural dilution from the mere loss of an occasional election." *Id.* at 2767 (citations omitted). In making this determination, courts are not to consider whether significant elements in the racial minority disagree with the plaintiffs' requested judicial remedy of single-member districts in which the racial minority constitutes a majority; whether creating "safe" black majority districts would perpetuate racial ghettos and racial polarization; or whether the remedy creates the risk of disrupting the normal processes of acquiring political power. 590 F.Supp. at 356–57 and 356–57 nn. 17–20, and authorities cited therein.

### a. Threshold Considerations in Polarized Voting Claims

The theoretical basis for a Section 2 claim is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of the minority voters, and will minimize or cancel out the minority voters' ability to elect their preferred candidates. 106 S.Ct. at 2765.

"First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 2766 (footnote omitted).

"Second, the minority group must be able to show that it is politically cohesive." *Id.* at 2767.

"Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed ... usually to defeat the minority's preferred candidate." It is "[i]n establishing this last circumstance, [that] the minority group demonstrates that submergence in a white multi-member district impedes its ability to elect its chosen representatives." It is the "usual predictability" of the majority's success that distinguishes vote dilution from the mere loss of an occasional election. *Id.*

In considering these circumstances under the *Gingles* standard, the Fourth Circuit noted that this Court should not consider causative factors such as backlash and field limitation in determining whether there is racially polarized voting. Rather, this Court

should inquire separately into minority and majority voting, to see whether members of the minority usually vote for the same candidates—if so there is the requisite minority political cohesiveness—and to see *whether the majority vote is sufficiently homogeneous to cancel the minority vote plus the cross-over vote.* These inquiries together determine whether there is a "pattern of racial bloc voting that extends over a period of

time," a critical factor in a claim of vote dilution under § 2.

816 F.2d at 935-36 (emphasis added).

As to the first consideration, the Court finds that Norfolk's black population is sufficiently large and geographically compact to constitute an effective voting majority of 65 percent in no more than two of the proposed wards. *See* 590 F.Supp. at 358 n. 21; *see also* Tr. 1661, 1702 (Testimony of William P. Robinson, Jr.).

While the Court recognizes that, in Norfolk, black voter registration and participation is far greater than in *Gingles*, it is noteworthy that in *Gingles*, defendants' expert witness testified that a 65 percent black majority was necessary to create a "safe" black district, and that the Justice Department uses 65 percent as a benchmark for their administration of the Voting Rights Act. It is doubtful that establishing a ward system would produce a greater black presence on Norfolk's City Council than is already there.

Plaintiffs' Exhibit 52 sets forth plaintiffs' proposals for ward boundaries designed to give blacks three safe seats. The proposal sets 32,614 as the ideal population per ward. This excludes, however, the military population of 38,680—a larger segment of the population than that contained in any proposed ward. Additionally, none of the proposals provides for a 65 percent or better black population in as many as three wards. It is highly doubtful that a plan excluding military personnel, who are included in census figures, would pass constitutional muster. *See Reynolds v. Sims*, 377 U.S. 533, 563-68, 84 S.Ct. 1362, 1382-85, 12 L.Ed.2d 506 (1964). If the military were included, none of the five proposals would have any validity.

As to the second consideration, the Court finds that the record is clear that Norfolk's blacks are politically cohesive. *See* Def.Ex. 470 (A-I) and 1986 Stip.

However, the Court finds, for reasons stated below, that Norfolk's whites do not vote sufficiently as a bloc that they usually defeat the minority's preferred candidate. The third element is therefore lacking.

### b. White Bloc Voting: The Test for Legal Significance

The Supreme Court in *Gingles* did not set forth a "lucid explication of all features of the amended § 2," 816 F.2d at 935, nor did it establish a simple, doctrinal test for legally significant bloc voting. It did make clear that a mere preference for different candidates among voters of different races is not legally significant.

The *Gingles* district court found, based on statistical evidence presented by qualified experts, that blacks and whites generally preferred different candidates, and that the correlation between the voters' race and choice of candidates was "substantively" significant. 590 F.Supp. at 368. *See also* 106 S.Ct. at 2768. Under the Supreme Court's *Gingles* rule this establishes racially polarized voting, and is sufficient to show the cohesiveness of the black minority.

However, after a careful reading of the Supreme Court's *Gingles* opinion and the Fourth Circuit's opinion on remand, it is clear that polarized voting is not legally significant *unless the white bloc voting usually defeats minority-preferred candidates* despite the combined votes of blacks and white "cross-over" votes. The Supreme Court found that while the *Gingles* district court did not use the phrase "legally significant," the record was sufficient to show that the polarized voting in North Carolina met the *Gingles* test for legal significance. 106 S.Ct. at 2771 and 2771 n. 27.

The evidence relied on in *Gingles* included statistical studies of 53 elections between 1978 and 1982 in which black candidates ran. The *Gingles* district court found that in no North Carolina election, primary or general, did a black candidate receive a majority of white votes cast, and that an average of 81.7 percent of white voters did not cast any votes for any black candidates. White voters in the general elections consistently ranked black candidates last or next-to-last, except in heavily Democratic areas. There, white voters still rated blacks last or next-to-last among Democrats, if not last or next-to-last among

all candidates. Furthermore, the district court found that in North Carolina approximately 66 percent of all white (Democratic) voters would not vote for a black Democrat even after the candidate had won the Democratic primary and the only alternatives were to vote for a Republican or no one. 590 F.Supp. at 368. (*Gingles* does not indicate that there were any black-preferred candidates who were not black.)

Only "some" black incumbents were re-elected, and the black incumbents did not receive white majority support even when the election was uncontested. *Id.* at 368–69. The *Gingles* court noted that black participation in North Carolina's political process had recently increased markedly, but that

> [t]he participatory level of black citizens is still minimal in relation to the overall black population, and ... is largely confined to the relatively few forerunners who have achieved professional status or otherwise emerged from the generally depressed socio-economic status which ... remains the present lot of the great bulk of black citizens.

*Id.* at 372.

Similarly, in *City of Petersburg, Virginia v. United States*, 354 F.Supp. 1021 (D.D.C.1972), *aff'd*, 410 U.S. 926, 93 S.Ct. 1441, 35 L.Ed.2d 698 (1973), the United States District Court for the District of Columbia analyzed black and white voting patterns in Petersburg's at-large elections, to determine whether annexation of a predominately white area would impermissibly dilute black votes.

In *Petersburg*, the City sought a declaratory judgment under Section 5 of the Voting Rights Act to determine the validity of the proposed annexation, which would have increased the white population by almost 50 percent, and would have eliminated Petersburg's black population majority. The district court found that Petersburg had experienced a "dramatic polarization of the races," and also found "almost total bloc voting by race" in the Petersburg elections. *Id.* at 1025. In the all-white precincts, no more than 8.5 percent of the total vote was ever cast for black candidates in a given

election, while in the black precincts the combined total of all votes cast for white candidates never exceeded 19 percent. In contrast, white vote for white candidates never fell below 91 percent or black vote for black candidates below 81 percent. *Id.* at 1026 n. 10. Two black candidates had won separate elections while whites held a voting majority, but

> [w]hen there was a possibility that by re-electing [a black incumbent] and electing another black candidate, the black members would control the council, there was an unusually large turnout of white voters in the white wards, as a result of which [the black incumbent] was defeated and the second black candidate also lost.

*Id.* at 1026 (footnote omitted).

Similarly, in *City of Rome v. United States*, 472 F.Supp. 221 (D.D.C.1979) (three judge court), *aff'd*, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980), a black candidate defeated three whites in the primary but was defeated in the general election when whites, turning out in unusually high numbers, apparently "coalesced to defeat [the black candidate]" whose election appeared imminent. 472 F.Supp. at 227. The Supreme Court found that the black candidate's defeat in these circumstances was indicative of racial bloc voting. 446 U.S. at 184 n. 20, 100 S.Ct. at 1565 n. 20. *See also Butts v. City of New York*, 614 F.Supp. 1527, 1545–46 (S.D.N.Y.1985) (in the one election year where a minority candidate appeared on the run-off slate, he lost overwhelmingly to a white candidate in an election unusual for its high voter turnout).

The situation in Norfolk is quite different. In Norfolk, as discussed below, the white cross-over vote has combined with the black vote to elect the black-preferred candidates most of the time. Norfolk does not have the extreme and entrenched pattern of bloc voting found in *Petersburg, Gingles* and the other cases cited above.

It is undisputed that the Norfolk City Council elections are nonpartisan, at-large elections under a simple plurality vote system, in which all candidates compete for open seats. The four-year terms for the

seven-member council are staggered, so that every two years either three or four seats (and in one case, six) are available. Fields of candidates have ranged from eight to twenty-one, with an average of thirteen. These large fields tend to fragment whatever white bloc voting might occur, and work to the advantage of black voters, who tend to concentrate their votes. *See* Tr. 1968 (Testimony of Dr. O'Rourke); Def.Ex. 470 (A–I); 1986 Stip.

White cross-over voting for a black candidate has been above 20 percent in 70 percent of the Norfolk elections. In half of the elections, including the three most recent, white cross-over voting for a black candidate has exceeded 25 percent. Def.Ex. 474–A; 1986 Stip. White cross-over support in elections from 1968 through 1986 has averaged almost 25 percent for the 19 black-preferred candidates (that is, those candidates who received over 50 percent of the black vote in a given election). This is more of the white vote than over half of the white candidates have received. Def.Ex. 470; 474–A; 1986 Stip.

This 25 percent white cross-over vote is even more impressive when considered in light of the relative numbers of blacks and whites in the population. For example, a black candidate, such as Reverend Green, who received 92 percent of the black vote in 1978, received approximately 11,000 black votes. His actual 26 percent white cross-over vote means that approximately 5,600 to 5,700 white voters joined with the 11,000 blacks to ensure the success of the black-preferred candidate. *See* Def.Ex. 470 (A–I); 1986 Stip. Thus, he received approximately one-third of his total vote from white voters.

In Norfolk, black registration and turnout percentages have remained at or above the level for whites since 1980. 816 F.2d at 939; 768 F.2d at 574–75; 605 F.Supp. at 385, 402, 404. In *Gingles*, white cross-over vote was virtually nonexistent, and even those black-preferred candidates who received the most white cross-over votes usually lost. In Norfolk, those candidates have usually won, as will be more fully discussed below.

The Court finds, based on the evidence presented, that in Norfolk's City Council elections, black-preferred candidates usually win, and that white bloc voting does not usually defeat the black voters' preferred candidates. Plaintiffs have failed to show that the at-large system "operates to minimize or cancel out" their ability to elect their preferred candidates. 106 S.Ct. at 2765 (citations omitted). They have therefore failed to meet the threshold test of Section 2, the establishment of legally significant, racially polarized bloc voting. Plaintiffs' Section 2 claim must fail.

### 5. Black Electoral Success Under The Gingles Standard

Although the election of a few minority candidates does not necessarily foreclose a vote dilution claim, the extent to which members of a protected class have been elected to office is one circumstance which may be considered. 106 S.Ct. at 2779 (citations omitted). This Court's duty is to conduct an independent consideration of the record and to make "a searching, practical evaluation of the past and present reality in determining whether [Norfolk's] political processes are equally open to all voters." *Id.* (citations omitted).

The Supreme Court in *Gingles* adopted what is in essence a new defense to a Section 2 claim: that roughly proportional minority electoral success will defeat a Section 2 claim even if such factors as racially polarized voting are present. Accordingly, the Fourth Circuit asked this Court to determine

[w]hether, as a factual matter, black electoral success in Norfolk has been so consistent and nearly proportional as to overshadow any racially polarized voting and other factors tending to dilute minority political access.

816 F.2d at 937.

In making this determination, a comparison of black electoral success in the challenged North Carolina districts with black electoral success in Norfolk will be helpful.

### a. Black Electoral Success in North Carolina and Norfolk

The *Gingles* court found a significant disparity between the electoral successes of blacks and of whites. At the time of trial (in 1984), North Carolina's black citizens constituted 22.4 percent of the State's total population, but held only 9 percent of the city council seats; 7.3 percent of county commission seats; 4 percent of sheriff's offices; and 1 percent of the offices of the Clerk of the Superior Court. There were 19 black mayors, 13 of whom were from majority black communities. Approximately 40 percent of the 9 percent of city council members who were black were from majority black municipalities or districts. Thus, in *Gingles*, only 5.4 percent of all city council members were blacks elected in areas where whites outnumbered blacks, although blacks made up 22.4 percent of the population. 590 F.Supp. at 365. In contrast, Norfolk's City Council is at present, and has been since the 1984 election, 28.5 percent black. This figure is far more nearly proportional to Norfolk's 35.2 percent black population than the 5.4 percent figure is to North Carolina's 22.4 percent black population. *See* 605 F.Supp. at 382.

Between 1971 and 1982, black representation in North Carolina's legislature ranged between 1.6 percent and 3.3 percent of the House seats, and 2 percent and 4 percent of the Senate seats, although the electorate was 22.4 percent black. 590 F.Supp. at 365. By contrast, from 1970 to 1982, Norfolk's City Council ranged from 14.3 to 28.6 percent black. More importantly, black voters in Norfolk between 1968 and 1986 elected their first or second choice 100 percent of the time, in fields of as many as 21 candidates. *See* Def.Ex. 470(A–I); 1986 Stip. From 1970 to the present, Norfolk's City Council has included at least two, and sometimes three, members who were endorsed by black civic groups and who received majority black support. 605 F.Supp. at 400. All black incumbents who have run have been re-elected, a success rate of 100 percent, while the white incumbents' success rate has

been only 80 percent. *See* Def.Ex. 470(A–I); 1986 Stip.

In North Carolina, black-preferred candidates who won Democratic primaries in the challenged districts were three times as likely to *lose* the general election as were their white counterparts. 590 F.Supp. at 365. No blacks had ever been elected to the State Senate from the area encompassed by House Districts 2, 8, 23 and 39. *Id.* at 366. Only one black had been elected in this century to the State Senate in Senate District 22, and from the area encompassed by House District 21, although in the latter case the Senator was elected for two terms. *Id.* at 365–66. Through 1983 there were only one or two blacks at any time in the 50–member State Senate, a mere 2 percent to 4 percent, although blacks then constituted about 22 percent of the total North Carolina population. *Id.* at 365. In the area encompassed by Senate District 22, there had been a total of nine other black candidates, seven for the House, and two for the Senate, all of whom been defeated. *Id.*

In Norfolk, considering *all* candidates (and not just those who received majority support), 30.43 percent of all black candidates who have run for City Council since 1968 have won, compared with 29.24 percent of all white candidates. *See* Def.Ex. 470(A–I); 1986 Stip.

North Carolina's black candidates for the State House of Representatives fared only slightly better than candidates for the State Senate. From 1971 through 1982 there were never more than two to four blacks in the 120–member House of Representatives (a mere 1.6 to 3.3 percent of the House members). 590 F.Supp. at 365. No black Representative had ever been elected from House District 8, *id.* at 366, and only one from House District 36. *Id.* at 365. In House District 39, only one black Representative had ever been elected before the *Gingles* lawsuit. Two were elected after the suit was filed. *Id.* at 366. The court indicated that their election may have resulted from "unusual organized political support by white leaders concerned to forestall single-member districting...." *Id.* at

367 n. 27. In House District 21, a black Representative was twice elected to the State House, and was serving at the time of trial. *Id.* at 366.

In House District 23 (Durham), however, one black citizen had been elected every two years since 1973 to the State House, and 25 percent (3 of 12) of the Durham City Council members were black. Durham is 47 percent black. *Id.* at 366. A plurality of the Supreme Court held that this steady pattern of success foreclosed plaintiffs' claims of vote dilution, notwithstanding that the black representation in Durham was not mathematically proportional. 106 S.Ct. at 2780 (Brennan, J.); 106 S.Ct. at 2783 (White, J.); 106 S.Ct. at 2793 (O'Connor, J.).

Apart from District 23, however, blacks did not fare well in city council elections in the challenged North Carolina districts. Black voters in Charlotte (House District 36; Senate District 32), for example, were 31 percent of the total population, yet were only 5.4 percent of the Charlotte City Council's at-large elected members before 1975. From 1977 to 1981, blacks won 28.6 percent of the district seats and only 16.7 percent of the at-large seats. 590 F.Supp. at 365.

Norfolk's blacks were 28.3 percent of the population until 1980, and approximately 35 percent since then. *See* 605 F.Supp. at 382; Def.Ex. 107 at Table P–1. Black-preferred candidates consistently held 28 percent of the City Council seats from 1968 to 1984, and presently hold 41 percent, all elected at-large. *See* Def.Ex. 470(A–I); 1986 Stip.

After the *Gingles* trial, a black candidate was elected mayor of Charlotte, receiving approximately 38 percent of the vote. 590 F.Supp. at 366. In the area encompassed by House District 21, there had been a one-term black mayor in the early 1970's, and one black city council member. There was one black on the County School Board, one on the seven-member Board of County Commissioners, and a twice-elected black sheriff. In House District 36 (Senate District 22), one black citizen was elected three times and defeated once for the Board of County Commissioners. 590 F.Supp. at 365–66. Only two blacks had ever been elected to the Board of Education. In House District 39, one black had been elected, then defeated twice, then re-elected to the otherwise all-white, eight-member Board of Education. Another had been elected, then defeated, then re-elected to the Board of County Commissioners. *Id.* at 366.

In House District 8, a similar pattern emerged. There had been only two black members of the Board of County Commissioners in one of the three counties that comprise this district (both elected since 1982), and none in the other two counties. There was only one black Board of Education member, at the time of the *Gingles* trial, in a community that was 36.5 percent black. *Id.* at 366. The City of Wilson, North Carolina, located in House District 8, had one black councilman out of six, in a 40 percent black community. Likewise, in the area encompassed by Senate District 2, all black candidates who had run for the Halifax Board of County Commissioners and for the Roanoke Rapids City Council had lost. *Id.*

Based on the record summarized above, the district court in *Gingles* found that the overall results achieved to date by blacks at all levels of elective office in North Carolina were minimal in relation to the percentage of blacks in the total population. 590 F.Supp. at 367. This is not the case in Norfolk, as the evidence makes abundantly clear.

### b. Statistical Models of Racial Voting Patterns

The City of Norfolk does not maintain voter registration or turnout figures by race, nor does the secret ballot permit observation of how a particular voter of a particular race voted. Tr. 721. Therefore, both plaintiffs and defendants used statistical estimates of voting behavior. 605 F.Supp. at 386. The only information from which these estimates can be drawn is the total number of people who register and vote in a precinct, and the total number of votes cast in a precinct for a particular candidate. These numbers are then applied to the precinct's racial composition, based on census data, in order to estimate how

many blacks and how many whites voted for specific candidates. Tr. at 883–84.

The two standard statistical methods used to analyze group voting behavior are the "regression analysis" and the "homogeneous precinct", or "extreme case" analysis methods. Both were employed at trial, Tr. 1834–36, 1948, and both were acknowledged by the Supreme Court in *Gingles* as standard techniques for use in voting rights cases. 106 S.Ct. at 2768 n. 20.

The Fourth Circuit indicated that it believed that this Court did not admit plaintiffs' regression analysis into evidence. Plaintiffs' regression analyses were admitted into evidence as Exhibit P–50–b. Tr. 582. Nevertheless, this Court found that plaintiffs' studies contained serious methodological flaws which severely undercut their probative value. *See* 605 F.Supp. at 387. The Court of Appeals for the Fourth Circuit did not challenge this Court's finding of methodological flaws except to the extent that plaintiffs may have been asked to isolate variables other than race. On remand, the Fourth Circuit only asks this Court to clarify its position on plaintiffs' methodology. *See* 816 F.2d at 936.

During discovery and trial, plaintiffs presented three statistical reports by Mr. Brace and Mr. Peterson, and one by Dr. Engstrom. *See* Def.Ex. 99, 103; Ex. P–50–b. Each employed regression analysis and each yielded different turnout, registration and vote totals for the same elections. For example, in 1978 by a homogeneous precinct analysis black incumbent Joseph Green received 32.2 percent of the white vote. Def.Ex. 470(D). Plaintiffs' regression analysis yielded a figure of 20.2 percent in the first report, Def.Ex. 99; 18.7 percent in the second report, Def.Ex. 103; and 26.5 percent in the third report. Ex. P–50–b.

Again, using homogeneous analysis, Mason Andrews received 16.7 percent of the black vote in 1974. Def.Ex. 470(F). Using plaintiffs' regression analysis, however, Andrews' percentage for that same election changed from 17.4 percent in the first report, Def.Ex. 99, to 9.4 percent in the third report. Ex. P–50–b.

The first report listed two black candidates as white candidates, contained errors in nomenclature, did not weight the computations to allow for differences in precinct size and excluded 38,000 mostly white, voting-age Navy residents. Tr. 475, 491–92, 495–96, 547 (Testimony of Carl B. Peterson). *See* Def.Ex. 99. Plaintiffs' second report, produced to replace the first report, repeated the errors in calculations and the errors in the race of two candidates. This report weighted all computations by voting age population, which plaintiffs' expert conceded was an error. The report still excluded 38,000 voting-age Navy residents. Def.Ex. 103; Tr. 495–520 (Testimony of Carl B. Peterson).

Plaintiffs' third report, produced four weeks before trial, weighted the data by precinct turnout, giving greater importance to election results in precincts with higher turnouts. Again, the Navy residents were "put in a hypothetical, nonexistent precinct, to eliminate them." Tr. 475, 543 (Testimony of Carl B. Peterson).

█ The exclusion of approximately 38,-000 predominately white, voting-age Norfolk residents residing on Norfolk's Navy bases or aboard ships home-ported in Norfolk (a full 17 percent of Norfolk's total population and a larger population than that of one of plaintiffs' "ideal" proposed wards), improperly skewed the results of their studies, inflating white registration and turnout figures, 605 F.Supp. at 387, and exaggerating the number of whites not voting for blacks. Tr. 527–28, 1842–43. The Fourth Circuit, in its first opinion, noted the impact of leaving out this large, mostly white population. 768 F.2d at 575 n. 6. These voters are eligible to run for office, are counted in the census figures for Norfolk, are considered by the State legislature in drawing House and Senate districts, and cannot properly be excluded from the voting calculations. Tr. 546, 1833; 605 F.Supp. at 387. This error was compounded in both the second and third reports by plaintiffs' further error of including as "white" the approximately 8,000 to 9,000 Norfolk residents who are neither white nor black. *See* 605 F.Supp. at 387,

Tr. 498–99. One candidate's race was still wrong in the third report. Tr. 539.

Another serious flaw in plaintiffs' regression analyses was the use of "double regressions", which led to such impossible results as figures indicating that a candidate received fewer than zero votes, or more than 100 percent of all votes. Tr. 943–48. These impossible results were then "normalized" by the introduction of a a "fudge factor". Tr. 551–52, 948. Plaintiffs' expert Dr. Engstrom admitted that he did not understand this "fudging" of figures. Tr. 948.

The fourth report, produced two weeks before trial, relied on data in the earlier reports, repeating the erroneous exclusion of the military, and including as white those voters who were neither black nor white. Tr. 942. This last report considered only three elections, Tr. 984, and also contained certain methodological weaknesses. Tr. 1845–50.

■ These methodological flaws are distinct from the issue of causative factors, and go directly to the reliability of the figures derived, and to the reliability of conclusions drawn from those figures. While regression analysis, properly performed, can yield probative results, the Court finds that the methodological weaknesses of plaintiffs' regression analyses have so distorted the resulting participation and vote percentages for the various candidates that plaintiffs' studies, and evidence based on these studies, can have only minimal probative value in this matter.

This Court will, therefore, base its conclusions on the *plaintiffs' and defendants'* homogeneous precinct analyses, which agree as to the black precincts, and are extremely close as to the white precincts, and which do not contain the fundamental flaws the Court finds in plaintiffs' regression analyses. The Court should, however, consider all statistical testimony with caution. See, for example, the testimony of plaintiffs' expert Mr. Brace where he testified that if 100 percent of all white voters cast one of their four votes for a black candidate in a four-seat election, his table would show only a 25 percent white cross-over vote. Tr. 800.

### c. Success of Black–Supported Candidates In Norfolk's Elections

■ The Supreme Court clearly contemplates that a "candidate of choice" of the black community may be of any race, and need not be black, as it consistently refers to the minority's preferred candidate, or candidate of choice, rather than the minority candidate. Four of the Justices would have so held. 106 S.Ct. at 2775 (Brennan, J.). Justice White disagreed that the candidate's race is *per se* irrelevant, and said it was not necessary to decide that issue. 106 S.Ct. at 2783–84. Justice O'Connor, writing for four Justices, agreed with Justice White that the candidate's race was not always irrelevant, and also agreed that the Court need not decide the issue. 106 S.Ct. at 2793. No Justice said that a black-preferred candidate must be black. Plaintiffs' expert Dr. Engstrom concurred. Tr. 992. The black community's candidate of choice remains the candidate of choice even if he or she received white support, and even if the candidate could not have been elected without that white support. As Justice Brennan wrote for the plurality, "Under § 2, it is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate, that is important." 106 S.Ct. at 2776 (emphasis in original). This Court must, therefore, ask who are the black community's candidates of choice, and then ask whether white racial bloc voting usually defeats the combined black vote and white cross-over vote for these candidates.

### i. Majority Black Support

More than half of all candidates receiving majority black support have been elected in the past eighteen years. Def.Ex. 470(A–I); 1986 Stip.

With whites in Norfolk comprising two-thirds of the population, they could win every seat if they were in fact voting as a racially polarized bloc. On the contrary, the record indicates that between 1968 and

1986 white-preferred candidates have won only 25 of the 38 seats contested, or 65.79 percent. *See* Def.Ex. 470(A–I); 1986 Stip. This success rate corresponds almost exactly with the proportion of whites in the population: 66 percent.

The substantial success rate of black-preferred candidates, electing 11 candidates for 38 contested seats (29 percent), is roughly equivalent to the proportion of blacks in the population (28 percent until 1980, and 35 percent after 1980). Def.Ex. 470(A–I); 1986 Stip. Therefore, both races are electing their preferred candidates in numbers roughly proportional to their percentages of the population.

More than half of all black-preferred candidates (11 of 19), and 100 percent of black incumbents, have won. In Norfolk City Council elections, whites have voted for black-preferred candidates in numbers sufficient to enable them to be elected. Tr. 1952–53, 1970–71 (Testimony of Timothy J. O'Rourke). In 1986, under homogeneous precinct analysis, black voters elected their first and third choices, while white voters elected their first, second and fourth choices. In 1986, Randy Wright was the white voters' third choice, under homogeneous analysis, with 60 percent of the white vote. (He was the whites' second choice under the 1986 stipulated regression figures, with 70 percent.) He lost the election because of a lack of black support, despite his preferred position among whites. 1986 Stip.

Plaintiffs' argument that candidates most preferred by the black voters were defeated in three of the five elections between 1974 and 1982 does not stand up to closer examination. The basis for their assertion is that their regression analysis, the defects in which are discussed above, purportedly shows that Mrs. Butts, who lost, received 93.1 percent of black-voter support and Reverend Green, who won, was second with 92 percent. However, plaintiffs' expert testified at trial that the election estimate figures were "too close to call." Tr. 917. In other words, the estimates for the two candidates were too nearly identical to afford grounds for plain-

tiffs' statement. If plaintiffs' own homogeneous analysis figures are used, however, Reverend Green is the first choice of black voters, over Mrs. Butts, which would produce three wins and two losses by black voters' first choice (a 60 percent success rate) for that period. *See* Ex. P–50–b.

Plaintiffs' reliance on Exhibit P–185 (Table 11), which purports to show that between 1974 and 1982 there have been twelve black candidates for Norfolk City Council, of whom only three were elected, is also misleading. Six of the nine losing candidates, including plaintiffs Reid, Collins, Banks and plaintiffs' counsel Gay, were rejected by the black community, leaving only three candidates who received a majority black vote but lost the election. These three were actually only two individuals: Mr. Bond in 1974, and Mrs. Butts in 1980 and 1982. Tr. 805–09 (Testimony of Kimball W. Brace). Mrs. Butts lost in 1980 by only 405 votes, and still ran ahead of the white incumbent, Conoly Phillips, who was defeated. Tr. 1978.

The black community's first choice candidate has been elected in six of the eight elections since 1972 (the cut-off date used in *Gingles*), establishing a success rate of 75 percent for the candidate of first choice (or 78 percent if the 1968 election is included). If the black community's candidates of first and second choice are considered, the figure rises to a highly satisfactory 100 percent rate of success for first or second choice for the last eight consecutive elections. These results are even more probative of black electoral strength in view of the crowded fields of candidates in each election. *See* Def.Ex. 470(A–I); 1986 Stip. The elections in Norfolk contrast sharply with the elections in *Gingles'* District 23, where half of the blacks elected were unopposed. 590 F.Supp. at 370. The Court finds unpersuasive, and indeed misleading, plaintiffs' argument that some black-supported candidates "lost in six of the eight City Council elections since 1970 and lost in all three elections held in the 1980's." *See* Plaintiffs' Memo on Remand at 38, Table 2. The record reflects, and this Court finds, that in each of the eight staggered term elections, at least one first or second choice

black-supported candidate was elected; therefore, since 1974 there have been at all times at least two sitting Council members who received black majority support. *See* Def.Ex. 470(A–F); 1986 Stip.

> As the Fourth Circuit noted on remand,
> Unlike the situation in the disputed ... districts at issue in *Gingles*, ... black voter registration and turnout have recently increased in Norfolk. The district court acknowledged that fact, *see e.g.*, 605 F.Supp. at 402, 404, as did this Court in its first opinion, *see* 768 F.2d at 574–55. This factor is probative, but not dispositive, of black electoral participation, and there is no reason to believe that the district court viewed it as inordinately important.

816 F.2d 939.

At oral argument on remand, plaintiffs' counsel represented to this Court that the Fourth Circuit had settled the issue of black electoral success in Norfolk as a matter of law. Transcript of December 16, 1987 Oral Argument ("O.A.") at 59–60. Mr. Parker said, in response to questions from the Court, that the following language, which he quoted, was a ruling of law, binding upon this Court:

> The myriad numbers before this panel seem to indicate a consistent level of political success by Norfolk blacks that nevertheless is not as conspicuous as that achieved by the black community in North Carolina District 23.

816 F.2d at 937 (footnote omitted). Counsel argued that this language barred this Court from ruling on the matter. By omitting the sentence immediately following the portion he presented, and by omitting footnote 5, counsel seriously misstates the law of the case. The omitted sentence in the quoted passage makes it absolutely clear that the Fourth Circuit is not substituting its judgment on matters of fact for that of the District Court when it says:

> *On remand, the district court must determine* whether, as a factual matter, black electoral success in Norfolk has been so consistent and nearly proportional as to overshadow any racially polar-

ized voting and other factors tending to dilute minority political access.

*Id.* (emphasis added).

The omitted footnote further undercuts plaintiffs' interpretation of the Fourth Circuit's remand opinion:

> The question is not, however, so simple as how many blacks versus whites were elected. The court must examine the parties' studies of voting preferences to determine which were the preferred candidates of the majority and minority communities.

*Id.* at n. 5. Plaintiffs' counsel's selective citation did not stop there. Counsel also argued that the Fourth Circuit had ruled that several candidates who had received a majority of the black vote in particular elections could not, as a matter of law, be counted as examples of "minority electoral success." O.A. at 59–61. On this basis, plaintiffs' counsel would exclude Mrs. Howell and Mr. Staylor as candidates of choice in 1974, when Mr. Bond received more black votes than they did, but lost, and would exclude Mrs. Howell in 1980 when Mrs. Butts received more black votes but lost. *Id.* at 61.

In 1974, with CCN support, Mrs. Howell ran second out of twenty-one candidates among black voters, running ahead of three black candidates among black voters. In 1980, Mrs. Howell, with CCN endorsement, beat Mrs. Butts by over 2,300 votes, and received more than twice the black votes received by plaintiff George Banks. In 1984, Mrs. Howell again beat Mrs. Butts as a result of Mrs. Butts' decline in black support. Def.Ex. 470(A, C, F). Delegate Robinson confirmed Mrs. Howell's black support. Tr. 1668.

Mr. Staylor, endorsed by CCN, received votes of 56.5 percent of all black voters in 1974, ahead of three black candidates, including plaintiff Milton Reid. Def.Ex. 470(F). Delegate Robinson testified that Mr. Staylor was supported by blacks in 1974, Tr. 1667, and Judge Jordan testified that Mr. Staylor "had the overwhelming support of the black community when he first ran for Council." Tr. 1535. The evidence strongly indicates that Mrs. Howell

in 1974 and 1980, and Mr. Staylor in 1974, were in fact candidates of choice of the black community and that any presumption created by the defeat of the first-choice candidates in those elections has been rebutted. Again, counsel misstates, by selective omissions, the law of the case, quoting that:

> The mere election of a candidate who appears to have received votes from more than fifty percent of minority ballots does not count as a minority electoral success, when each ballot may contain votes for more than one candidate. In such a situation, if there were other candidates, preferred by a significantly higher percentage of the minority community, who were defeated in the same election, then it cannot fairly be said that the minority community has successfully elected representatives of its choice.

O.A. at 61 (citing 816 F.2d at 937). When asked by the Court whether the quoted language is a presumption or a ruling of law, counsel said "[I]t is binding on this Court. It's a legal holding of the Fourth Circuit" O.A. at 59. Again, omitted language contradicts counsel's words. The paragraph concludes:

> Each such situation must be reviewed individually to determine whether the elected candidates can be fairly considered as representatives of the minority community. The presumption must be that they cannot, if some other candidate has received significantly more minority votes.

816 F.2d at 937. *See also id.* n. 6 ("[t]his may have been the case in the 1974 and 1980 elections in Norfolk ..."). A presumption may be rebutted.

Based on this Court's detailed investigation of the particular factual circumstances of the elections at issue here, the Court finds that the presumption of nonrepresentation has been overwhelmingly rebutted as to the challenged candidates' status as chosen representatives of the minority voters.

#### ii. Endorsements by Black Civic Groups

Another indication of which candidates are the candidates of choice of the black community is the endorsement of certain candidates by black civic organizations.

The Concerned Citizens of Norfolk (CCN), is the leading black civic group involved in the elections at issue here. CCN has endorsed 25 candidates between 1972 and 1986, 15 of whom have been elected (60 percent). 605 F.Supp. at 400; 1986 Stip. Officials of CCN testified in favor of retaining Norfolk's present at-large City Council electoral system. Tr. 1632 (Testimony of Evelyn Butts); Tr. 1659–63 (Testimony of William P. Robinson, Jr.). In 1986, CCN endorsed four candidates, two of whom won. 1986 Stip.

CCN's position as the bellwether of black support is demonstrated by the election statistics for Dr. Mason Andrews. In 1978, Dr. Andrews, with CCN endorsement, received 43.5 percent of the black vote. In 1982, he lost that endorsement, and received a scant 5.8 percent of black support. Def.Ex. 470(D and B). This figure rose to 38.4 percent in 1986 when CCN again endorsed him. 1986 Stip.

Plaintiff Dr. Milton Reid sought, but did not receive, CCN's endorsement in 1974, and failed to win even half the black votes. Plaintiff George Banks ran in 1980, in a field of twelve with one other black candidate. CCN endorsed the other candidate, Mrs. Butts, who received 92.9 percent of the black vote. Mr. Banks received only 36 percent. In 1982, plaintiff Collins and plaintiffs' counsel Mr. Gay each received less than 30 percent of the black vote without CCN support. 605 F.Supp. at 400. Likewise, in 1976 and 1980, G. Conoly Phillips ran without CCN endorsement, *see id.*, receiving 2.9 percent and 2.7 percent of the black vote in the respective elections. Def.Ex. 470(C, E). With CCN endorsement in 1986, his support among blacks increased to 29 percent, without which he would have lost the election. 1986 Stip.

In 1982, plaintiff Swindell, a black, ran for the Virginia legislature from the predominately black 89th District, but lost to the white, CCN-endorsed candidate Robert Washington, after seeking and failing to

receive CCN endorsement. Tr. 181–82 (Testimony of William E. Swindell, Jr.).

Additionally, Joseph Leafe, who was endorsed by CCN in 1984 but who did not receive black majority support, still received more black support with the CCN endorsement than did two black candidates who lacked that endorsement. 605 F.Supp. at 400.

At the time of trial, six of the seven City Council members were endorsed by CCN in at least one of their campaigns. *Id.* Plaintiffs' expert Dr. Engstrom conceded that four of the seven members of City Council as of July 1, 1984 could not have been elected without the support of black voters, and were accountable to the black community for their election. Tr. 1017. Five of the seven present Council members, all of whom were elected or re-elected in 1934 or 1986, could not have been elected without the black support they received. A sixth councilman, Paul Fraim, probably also depended on black voters' support. *See* Def.Ex. 470(A–I); 1986 Stip. This dependence on black support necessarily reinforces the City Council's responsiveness to the particularized needs of the black community.

Another black endorsement group, the Rainbow Coalition, supported two candidates in the 1984 election, both of whom were elected. *See* Def.Ex. 470(A); 480. In 1986, three of the four Rainbow Coalition candidates won. *See* 1986 Stip.

6. Special Circumstances Affecting Black Success

Because some apparent minority success may be due to special circumstances, the Court can appropriately take account of the circumstances surrounding any recent black electoral success in deciding its significance. 106 S.Ct. at 2780. The Supreme Court did not decide what types of special circumstances would demonstrate that apparent sustained minority success does not accurately reflect the minority's ability to elect its preferred representatives. *Id.* at 2780 n. 38. It merely held that blacks' political successes in some of the challenged North Carolina districts were not dispositive of plaintiffs' vote dilution claim because of unusual organized political support for blacks in those elections by white leaders concerned to forestall single-member districting. *Id.* at 2780 (citing 590 F.Supp. at 367).

The *Gingles* trial court noted in passing, and discussed in a footnote, what it termed the "obviously aberrational aspects" of the most recent North Carolina elections, which tended to cast doubt on the validity of the apparent gains made by North Carolina's black citizens in achieving success at the polls. Although the district court did not enumerate specific examples, the court emphasized evidence of "unusual organized political support by white leaders concerned to forestall single-member districting" in elections during the pendency of the litigation, noting that because "this cannot be expected to recur" the validity of black candidates' apparent success in the recent elections is "a matter of sheer speculation." 590 F.2d at 367 and 367 n. 27.

The *Collins* plaintiffs argue that every successful black candidate in the last twenty years has won due to special circumstances, and that therefore none of these victories should be considered a black electoral success. A comparison of the circumstances in *Gingles* with those in Norfolk will therefore be helpful.

The district court in *Gingles* said that North Carolina's recent history gave intimations that a "more substantial breakthrough of success could be imminent," but stated, as noted above, that "there were enough obviously aberrational aspects present in the most recent elections to make that a matter of sheer speculation." *Id.*

The court said:

In any event, the success that has been achieved by black candidates to date is, standing alone, *too minimal in total numbers and too recent in relation to the long history of complete denial of any elective opportunities* to compel or even arguably to support an ultimate finding that a black candidate's race is no longer a significant adverse factor in the political processes of the state—either

generally or specifically in the areas of the challenged districts.

590 F.Supp. at 367 (emphasis added).

Writing for the *Gingles* Court, Justice Brennan noted that the trial court could properly take into account the fact that the pending litigation could have artificially boosted black candidates' success in 1982, indicating in a footnote that this success could have been engineered by white politicians in order to block the litigation. 106 S.Ct. at 2780 and 2780 n. 37 (citation omitted). An additional exceptional circumstance occurred in the 1982 State House election in Durham County. Although the black candidate won one of the three available seats, there were only two white candidates, making the black candidate's victory a certainty. 590 F.Supp. at 368 n. 31.

This Court finds none of these aberrational factors in Norfolk's City Council elections, but will address each of plaintiffs' allegations in turn.

### a. Mayor Thomas' Support for Reverend Foster

 Plaintiffs' Memo on Remand suggests that black School Board member Reverend John Foster's election to City Council in 1984 was the result of "special circumstances" and was therefore was not probative of black electoral success. The alleged "special circumstances" were the former Mayor's decision not to seek re-election and to back a black candidate, and his remark that this case might become moot after the election.

This Court earlier found that former Mayor Vincent Thomas' decision not to seek re-election was not part of any conspiracy to elect John Foster and thereby to moot the instant lawsuit. 605 F.Supp. at 393. However, in its directions on remand, the Fourth Circuit stated that even in the absence of a conspiracy, "if voting patterns show unusual white support for the black candidate [Foster] in 1984, the legal significance of his success should be diminished." 816 F.2d at 938 (citations omitted). The Fourth Circuit therefore requested that this Court "examine the result of [Former Mayor Thomas'] conduct and statement," adding, "As long as that particularized in-

vestigation is made, however, the trial court's findings should not be disturbed on appeal unless they are clearly erroneous." *Id.*

It is clear from a comparison with *Gingles* that in the Norfolk elections there was no "obviously aberrational" pattern of white support such as that which occurred in the North Carolina elections. Neither Mayor Thomas' "mootness" remark nor his decision not to seek re-election in 1984 and to support a black candidate for election resulted in unusual white voting patterns in that election. Nor did his actions or inactions, or, indeed, the pendency of this lawsuit, have any other effect on the 1984 elections that would tend to diminish the probative value of black electoral success in that election.

Mayor Thomas testified that his support for Reverend Foster predated the commencement of plaintiffs' suit and that his decision not to seek re-election was for personal reasons. Plaintiffs produced no credible evidence to the contrary. There was no evidence that Mayor Thomas or any other white city officials or community leaders "orchestrated" Reverend Foster's election. The Court finds no evidence that Mayor Thomas' words and actions affected the 1984 elections in any way that would violate the Voting Rights Act.

There was no evidence of unusual white voting patterns in the 1984 election. In the 1984 City Council elections, ten candidates competed at-large for three available seats. There were two strong black candidates, Reverend John Foster and Evelyn Butts, but the white voter turnout was lower in 1984 than in any of the three previous elections. The percentage of white registered voters who turned out to vote was substantially lower than the percentage of black registered voters who turned out to vote. *See* Def.Ex. 470(A); 605 F.Supp. at 386.

Neither Reverend Foster, who was elected, nor Mrs. Butts, who was not, received unusual white support in 1984. Reverend Foster received 26.6 percent of white support, and Mrs. Butts received 24.2 percent. This was less than the white support given

Joseph Green in 1982 (31.1 percent) and in Green's first election in 1978 (32.2 percent). It was also less than the percentage of whites voting for Joseph Jordan in his first election in 1968 (28.7 percent). Indeed, it appears that had Mrs. Butts not lost a great deal of black support (down from approximately 93 percent in 1980 to approximately 72 percent in 1984) she, too, would have been elected to City Council, raising black incumbency to three of seven members. Her narrow defeat by a 400–vote margin cannot be attributed to white bloc voting nor to any other factor than her decline in support among black voters. *See* Def.Ex. 470(A–I).

Thus, while at least 26.6 percent of the white voters were willing to vote for one black candidate and at least 24.2 for the other, they did not turn out in unusual numbers, nor did they channel their support to the candidate allegedly picked by Mayor Thomas. The votes for Butts and Foster showed roughly the same geographic distribution, and this distribution was similar to the vote distribution for Reverend Green in 1982. *See* Def.Ex. 475(A and B); Def.Ex. 476. All in all, the election of a black in 1984 was consistent with past three-seat elections. In four of the five three-seat elections since 1968, a black candidate has been elected. 605 F.Supp. at 389.

### b. The "Westside Coalition"

Plaintiffs also argue that the 1984 election was unique because the so-called "westside business coalition" allegedly left one seat open for Reverend Foster by running only two white candidates. This is merely a variation on the previous argument: that white officials somehow engineered Reverend Foster's election. The evidence, discussed above, simply does not support such a finding. Plaintiffs' argument is weakened further by their reliance on testimony by Dr. Engstrom, who did not study the 1984 election in his polarization study, Tr. 1006, and who never studied political endorsements. Tr. 1000. The Court notes that notwithstanding the alleged absence of a third white candidate on the "business" ticket, there were, in all, six

white candidates in the 1984 election. The Court finds that Foster defeated four white candidates because of his strong following in the black community. The Court therefore finds that the 1984 election was not aberrational, was not the result of special circumstances, and was not the result of any action or inaction of Mayor Thomas or any other white citizens or officials, singly or in combination.

The results of the 1986 election, in which there were at least four strong white candidates for four Council seats, bear out the finding that the 1984 election was not aberrational. In 1986, Reverend Joseph Green won re-election, although four candidates received more white votes than he did, maintaining black representation on City Council at two of seven seats. He placed second in overall votes, defeating at least one white candidate (Wright) who received over 60 percent of the white vote. Far from being an aberration, this pattern of black electoral success built upon strong black community support, CCN endorsement (and more recently, Rainbow Coalition endorsement), and a steady white cross-over vote is indicative of the nonpolarized nature of Norfolk's City Council elections.

### c. Lack of an Opponent

The Court likewise finds that, contrary to plaintiffs' suggestions, there has been no Norfolk City Council election in which a black candidate won because there was no white opponent. In such a case, the election of the black candidate would certainly be the result of special circumstances, and therefore less probative of black electoral success. In *Gingles*, for example, there were several elections in the challenged North Carolina districts in which black candidates won because there were fewer white candidates than there were seats available. Necessarily, one black candidate had to be elected. *See* 106 S.Ct. at 2772 n. 29; 590 F.Supp. at 369–70. The Supreme Court noted that the absence of an opponent might constitute a special circumstance that would explain apparent black electoral success. 106 S.Ct. at 2772. However, in two decades such a situation has

not presented itself in Norfolk. On the contrary, blacks have consistently won, even when there were enough white candidates to fill the available seats several times over.

### d. Incumbency

■ Likewise, Reverend Green's incumbency at the time of the 1986 election does not make his re-election an aberration. In *Gingles,* the Supreme Court found that a successful minority candidate's incumbency could be a special circumstance, like the lack of an opponent, "bullet" voting, or other unusual factors, and that an incumbent's re-election did not necessarily negate a finding that racially polarized bloc voting usually defeated the black-preferred candidates. *See* 106 S.Ct. at 2770, 2772 and 2772 n. 29. The Supreme Court did not rule that re-elected incumbents must not be counted in evaluating blacks' overall electoral success. It merely ruled that sporadic black successes do not outweigh a pattern of black losses due to polarized white voting, such as the Supreme Court found in *Gingles.* In Norfolk, incumbency is one predictor of victory, to be sure: as previously shown, the re-election rate of black incumbents is 100 percent, which is greater than that of whites. Moreover, in Norfolk, unlike North Carolina, black-preferred candidates do not usually lose; they usually win. That some of the winners were incumbents does not negate the overall pattern of black success in Norfolk elections. The consistent willingness of white voters, as well as black, to re-elect black incumbents and to elect other blacks clearly shows that white bloc voting will not consistently defeat minority candidates in Norfolk.

### e. Appointment of Joseph Green

■ Plaintiffs also argue that Joseph Green's appointment to fill the vacancy left by Joseph Jordan's appointment to the bench was another "special circumstance" within the *Gingles* standard. This argument is also without merit. When Reverend Green ran for election for the first time, in 1978, he received 96.1 percent of the black vote, and was elected, although he came in sixth with white voters and only

five seats were available. Although he received a solid base of white support (32.2 percent), this was not significantly greater than the 28.7 percent of white support given Joseph Jordan in his first election in 1968, or the 26.6 percent given John Foster in 1984, although neither Jordan nor Foster was previously appointed. *See* Def.Ex. 470(A, D and I). It is evident that no unusual white support resulted from Reverend Green's appointment.

Green's appointment and subsequent election presents a far different situation than that in *United States v. Marengo County Comm'n,* 731 F.2d 1546 (11th Cir. 1984) cited by plaintiffs. In *Marengo,* no black candidate had ever been elected. The one black citizen appointed to the School Board had never faced election. *Id.* at 1572. In those circumstances, the Eleventh Circuit said, "The appointment of one black to the School Board ... certainly does not demonstrate the ability of black voters to elect officials," and added "[n]either would his subsequent *unopposed* re-election." *Id.* and 1572 n. 47 (emphasis in original). The *Marengo* decision is thus clearly inapposite to the instant case, where black candidates have regularly run for office and won election in hotly contested campaigns with large fields of candidates.

The other case upon which plaintiffs rely, *McMillan v. Escambia County, Florida,* 638 F.2d 1239 (5th Cir.1981), is likewise not pertinent to the present inquiry. In *McMillan,* two blacks were appointed to the Pensacola City Council, and both subsequently won re-election, although no black had previously been elected. One of the two appointees had previously run and been "soundly defeated by the usual white bloc vote." *Id.* at 1241 n. 6. These two exceptions did not, however, negate the general pattern of total black electoral failure in Pensacola and in Escambia County. *Id.*

It does not follow that, because Reverend Green was originally appointed to fill Judge Jordan's vacated seat, his subsequent decade of successful re-election campaigns in which he received 96.1 percent, 88.2 percent and 90.3 percent of black voter

support should be disregarded or treated as an aberration. On the contrary, based on this Court's careful examination of the factual circumstances of each election under consideration here, it is clear that Reverend Green's electoral success is legitimate and is not the result of special circumstances as contemplated in *Gingles*.

### f. Single–Shot or Bullet Voting

■ Plaintiffs' allegation that the at-large system vitiates black electoral success by forcing black voters to cast fewer votes than are available to them (that is, to use "single-shot" or "bullet" voting) is likewise without merit. The Supreme Court noted, as discussed above, that "bullet" voting may be a special circumstance that will explain an occasional black success in the face of racially polarized bloc voting. *Id.* 106 S.Ct. at 2770. The Court also quoted the Senate Report's conclusion that "anti-single shot" restrictions may violate Section 2. *Id.* at 2759.

The Supreme Court did not, however, say that use of single-shot voting was probative of a violation. Norfolk's black voters have on occasion successfully employed single-shot tactics. 605 F.Supp. at 389. It is abundantly clear, however, that it has not been necessary for blacks to depend on single-shot voting to win. While Norfolk's black voters generally trail white voters slightly in numbers of votes cast per voter, in 1976 and 1982, with more white candidates running than seats available, black voters cast slightly more votes per voter than did white voters, and successfully elected their preferred candidates without single-shot tactics. *See* Def.Ex. 470(B and E) and 472.

Norfolk has no restrictions on single-shot voting. This Court, therefore, finds that black electoral success has not been adversely affected either by restrictions on single-shot voting or by a need to rely on single-shot voting.

### 7. The Proportionality of Black Representation

■ The next question is whether black representation on Norfolk's City Council has been so nearly proportional as to preclude relief under Section 2 even if there were legally significant, racially polarized voting.

In *Gingles*, a black-supported candidate had won in every election held in House District 23 (Durham) from 1973 through 1982. 590 F.Supp. at 366. The district court nevertheless found a Section 2 violation based on its determination that House District 23 was deficient in all but one of the Senate Report factors, 590 F.Supp. 345, including the fact that three of the six successful black candidates were unopposed. *Id.* at 370.

The United States Supreme Court reversed, saying, "This persistent proportional representation is inconsistent with [the] allegation that the ability of black voters in district 23 to elect representatives of their choice is not equal to that enjoyed by the white majority." 106 S.Ct. at 2780 (Brennan, J.) (plurality).

■ Although this portion of *Gingles* was a plurality opinion, Justice Brennan was joined in reaching this conclusion by Justices White, Burger, Powell, Rehnquist and O'Connor. Writing for four of the Justices, Justice O'Connor noted

Blacks comprise 36.3% of the population in [District 23], and constitute 28.6% of the registered voters. In each of the six elections since 1970 one of the three representatives from this district has been a black.... Indeed, the 23 Court of Appeals' decisions on which the Senate Report relied, and which are the best evidence of the scope of this caveat, contain no example of minority electoral success that even remotely approximates the consistent, decade-long pattern in district 23.

*Id.* at 2794–95 (O'Connor, J., concurring in part). Thus, under *Gingles*, a Section 2 claim will be defeated if the black community is proportionally represented, notwithstanding any other factor. This holding does not create an entitlement to proportional representation, which is expressly denied by the language of Section 2.

On remand, this Court must determine as a factual matter whether black electoral success in Norfolk "has been so consistent

and *nearly proportional* as to overshadow any racially polarized voting and other factors tending to dilute minority political access." 816 F.2d at 937 (emphasis added). The Court finds that it has been.

As in District 23, candidates supported by a majority of black voters have won in every Norfolk election since 1972, and even earlier (1968). Since 1972, the Council has at all times had at least two members (28.6 percent) and in some years three members (42.9 percent) who had been supported by a majority of black voters in their last election. Further, from 1972 to 1986, black-preferred candidates in Norfolk have won an average of 34.5 percent of the City Council seats. The figures for black-supported candidates include Mrs. Howell and Mr. Staylor in 1974, and Mrs. Howell in 1980, who were candidates of choice of the black community in those particular elections, as the Court found above. These percentages are derived by averaging the percentage of seats won since 1972. *See* Def.Ex. 470(A–G); 1986 Stip. If each election is averaged separately, the percentage of seats won by black-preferred candidates is 34.2 percent. This figure is still roughly proportional to the 1980 total black population figure of 35.2 percent, and it exceeds the 1980 black Voting Age Population (VAP) of 31.5 percent, as well as the 1970 figures for both VAP (24.1 percent) and total population (28.3 percent). *See* 605 F.Supp. at 382; Def.Ex. 107.

This Court finds as a factual matter that blacks in Norfolk have had roughly proportional representation for longer than the time considered relevant for District 23 in *Gingles*, and holds as a matter of law that this finding of fact precludes relief under Section 2.

### 8. Slating

In the original *Collins* opinion, this Court found plaintiffs' contention that Norfolk City Council elections have been controlled by the "westside businessmen's coalition" to be unsupported by credible evidence. The Court held, "[P]laintiffs failed to prove the existence of a candidate slating organization which denies black candi-

dates access to the process." 605 F.Supp. at 391.

The Fourth Circuit, in remanding the case, took exception to this Court's definition of a candidate slating process. The Appeals Court held that a definition of a slating group as a group which offers candidates for *all* slots on the ballot was overly restrictive. 816 F.2d at 938–39. The Fourth Circuit stated, "[T]he fact that the alleged slating group in Norfolk sometimes endorsed candidates without giving endorsements for all available seats might be a *factor* in finding that it was not a slating organization that denied access to minorities, that fact does not contravene the Senate Report factor as a matter of law." *Id.* at 939 (emphasis in original).

Accordingly, this Court now reconsiders the evidence in the record related to the existence of slating, and the arguments presented by both sides in light of the Appeals Court's definition of slating.

#### a. Indicia of Slating in Norfolk

The existence of slating is significant because it is one of the factors to be considered in determining whether or not there has been a violation of Section 2 of the Voting Rights Act. The Senate Committee on the Judiciary described the factor as follows:

> [I]f there is a candidate slating process, whether the members of the minority group have been denied access to that process

S.Rep. at 28–29, 1982 U.S.Code Cong. & Ad.News p. 177, 206.

In their memoranda on remand, plaintiffs contend that the record clearly shows that black voters in Norfolk were denied access to the candidate slating process of the westside business coalition during the 1976 and 1980 elections. Plaintiffs argue that during these elections the alleged slating group "recruited, ran and supported slates of successful (except for Phillips in 1980) white candidates in the 1976 and 1980 city council elections, and that they excluded any black candidates from their slates of candidates." Plaintiffs' Reply Brief at 29.

Plaintiffs claim that in the 1976 Norfolk City Council election, the westside business coalition put up a slate of candidates consisting of Vincent Thomas and G. Conoly Phillips, and that Joseph Jordan, a black candidate, was "excluded because of his race." The only evidence plaintiffs point to in support of this conclusion is the deposition testimony of Vincent Thomas. The following deposition excerpt was quoted in plaintiffs' brief:

A. I had some talks with Judge Jordan about the general political situation in Norfolk. But no, there was no consideration of a ticket including Judge Jordan.

Q. Why not?

A. This was the political decision that was made at the time.

Q. And why was that political decision made? What was some of the reasoning behind it?

A. The reasons were political reasons. We felt that our primary goal was to get elected. We wanted to have as many things in our favor to get elected as possible. And so the decision was made that our best interest would be served by running the two of us in association.

Q. Do you feel it would hurt your ticket if you had included Judge Jordan?

A. At the time, that was just not a reasonable political possibility.

Q. What was not a reasonable political possibility?

A. Running the three as a ticket.

\* \* \* \* \* \*

Q. I'm trying to understand your testimony, Mayor. What was not a reasonable political possibility?

A. That there be a ticket of Mr. Phillips, Judge Jordan and myself.

Thomas Deposition at 20–22.

What plaintiffs failed to include in their brief is the following exchange, which occurred between the quoted portions above.

Q. So it was not a reasonable political possibility at the time to include a black on a ticket with two whites; is that right?

A. I didn't say that. I said under the circumstances that were then in Norfolk and the candidates involved, that that was not a possibility.

Q. Not a possibility to include a black on your ticket:

MR. CHAPPELL: That is not what he testified to. You keep coming back and testifying yourself, Mr. Parker. I object to the form of your question.

*Id.* at 21.

Seemingly, plaintiffs' attorney was attempting to have Mr. Thomas say that Mr. Jordan was excluded from the ticket on the basis of his race. In their brief on remand, plaintiffs conclude, "[T]he slating group believed that including a black candidate on the slate would compromise their 'primary goal,' which 'was to get elected.'" Plaintiffs' Reply Brief at 28. Plaintiffs offer no evidence to substantiate this bald assertion. The deposition testimony quoted in plaintiffs' brief took place in the context of discussing the inclusion of Joseph Jordan on the ticket with Vincent Thomas and Conoly Phillips. Even if, as plaintiffs allege, someone involved with the Thomas–Phillips ticket made a conscious decision not to include Joseph Jordan on the ticket, it does not necessarily follow that all blacks were discriminatorily denied access to a slating process. Indeed, in the 1976 Norfolk City Council election there were a number of other candidates who were also not included on the Thomas–Phillips ticket. Characterizing Mr. Thomas' deposition testimony as evidence of a discriminatory slating process requires drawing a number of inferences that are not supported by the evidence.

With respect to the 1980 election, plaintiffs claim, "proof shows that the Thomas–Phillips–Leafe ticket was a slate [from] which black candidates were excluded, and that the slate was identified as a business community ticket." Plaintiffs' Reply Brief at 28. In their brief, plaintiffs also make the statement, "Thomas admitted that in 1980 no consideration was given to including a black candidate in the Thomas–Phillips–Leafe slate." *Id.* at 28–29. The portion of Mr. Thomas' deposition testimony plaintiffs apparently rely on for this statement is as follows:

Q. Was there any consideration given by either you or, to your knowledge, Mr. Phillips, to recruiting a black to be on the ticket in 1980?

A. I cannot remember specifically, except to say that in the political discussions, everything is normally considered.

Q. But you cannot specifically recall any specific consideration given to including a black?

A. No. Well, let me—at the time we were interested in having qualified people on the Council, yes.

Q. Well, what does that mean?

A. Well, that means that we considered everybody.

Q. But you did not specifically discuss including a black person?

A. I really just can't recall that.

Q. Was there any reason why you did not give active consideration to including a black person?

A. I can't recall that, either.

Thomas Deposition at 37–38. A careful reading of the testimony shows that Mr. Thomas did not "admit" that a black candidate was not considered.

In a similar vein, plaintiffs claim that Joseph Leafe's deposition testimony confirms that no consideration was given to a black candidate. Plaintiffs' Reply Brief at 28–29. The testimony cited by plaintiffs to support their assertion is as follows:

Q. Did you give any consideration to including a black person on your ticket?

A. Well, I guess my answer is that I didn't have any input into the—I became the third person. So at that point in time, you know, there weren't any considerations left.

What considerations they may have had before that, I just really couldn't speak to.

Q. So you don't know of any considerations that might or might not have been given to include a black?

A. No, I didn't.

Leafe Deposition at 67. As with the testimony of Mr. Thomas, the testimony of Mr. Leafe simply does not support plaintiffs'

conclusion that no black candidate was considered.

Defendants contend, on the other hand, that Norfolk had no slating group or process that adversely affected the representation of blacks on the Norfolk City Council. In its earlier opinion, this Court, citing *McIntosh County Branch of the NAACP v. City of Darien*, 605 F.2d 753 (5th Cir. 1979), described various courts' concern with slating groups as "whether a small group of whites, acting as a formal or informal slating organization, effectively limits the ability of blacks to seek electoral office by excluding black candidates from its slating process." 605 F.Supp. at 403–04. Defendants argue that the situation in Norfolk, of which plaintiffs complain, if it was slating at all, is not the offensive type of slating discussed in the Senate Report and in case law, and that Norfolk blacks have not been disadvantaged by a discriminatory slating process.

b. Effects of Alleged Slating on City Council Elections

After considering all the evidence, this Court finds a number of factors relevant to its consideration of the slating issue. Initially, it is important to note that the influence of the alleged slating group in Norfolk City Council elections is relatively small. In the ten elections held between 1968 and 1986, there have been a total of 38 City Council seats available. Yet, plaintiffs allege offensive slating in only two nonconsecutive elections. Furthermore, these instances of alleged slating involved only five slots and three individuals: Vincent Thomas, Conoly Phillips and Joseph Leafe.

In 1976, one of the years in which plaintiffs allege slating, Joseph Jordan, a black, won, coming in third among white voters and beating seven white candidates, two of whom were incumbents. Def.Ex. 470(E). While the Court of Appeals stated that failing to endorse a full slate does not preclude the possibility of a group being a slating group, a partial slate may be a factor to consider. 816 F.2d at 939. With respect to the 1976 election, it is certainly relevant that the alleged slating group

filled only two of three available seats and a black candidate prevailed over numerous white candidates for the third seat.

This Court made the following unchallenged findings concerning the 1980 election in the original *Collins* decision.

> With regard to the 1980 election, Joseph Leafe testified that he was asked to run by then Mayor Thomas. Leafe had decided not to run again for the Virginia House of Delegates, in which he had served as a member from 1972 to 1980. Leafe stated that he did not have discussions with either Joshua Darden or Harvey Lindsey, identified during the trial by the plaintiffs as leaders of the "westside businessmen's coalition," before he decided to run. Leafe was not recruited to run by any single group; rather he was encouraged to run by voters from throughout the City. Leafe ran with Thomas and Phillips in 1980 and the three shared election expenses. They did not consider themselves to be a businessmen's slate. Leafe and Thomas were elected; Phillips was not. There is no evidence that the three candidates were recruited by a slating organization. It is more likely that the two incumbents, who had run together successfully in the 1976 election, sought a third candidate who shared their stance on the issues and who would be willing to share campaign expenses.

605 F.Supp. at 390–91.

The 1980 election results support the conclusion that the alleged westside businessmen's slating group did not control the City Council elections and did not deny blacks access to the process. In the 1980 election, the candidate who received the greatest number of votes, Mrs. Howell, was supported by CCN, but not by the westside businessmen. *See id.* at 400; Def.Ex. 470(C). Conoly Phillips, an incumbent and member of the alleged westside slate, was not re-elected and received fewer votes than black candidate Evelyn Butts. Significantly, following the 1980 election only two of seven members of the Norfolk City Council had been supported by the alleged

westside business slating group. *See* Def.Ex. 470(C).

### c. The Supreme Court's Interpretation of the Significance of the Slating Factor

In remanding *Collins*, the Fourth Circuit conceded that there is "no consensus in federal law or in political science texts on a definitive meaning of the phrase 'slating group.'" 816 F.2d at 938. However, the Court did cite two Supreme Court cases, *White v. Regester* and *Whitcomb v. Chavis*, which it considered important sources for the phrase "slating group."

In *White v. Regester*, a voting rights case, the Supreme Court required the plaintiffs to prove that members of the group in question "had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." 412 U.S. 755, 766, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). In *White*, the district court had found that the Dallas Committee for Responsible Government (DCRG) was a "white-dominated organization that [was] in effective control of Democratic Party candidate slating in Dallas County." *Id.* at 766–67, 93 S.Ct. at 2340. The lower court had also found that without the endorsement of DCRG it was "extremely difficult to secure either a representative seat in the Dallas County delegation or the Democratic primary nomination." *Id.* at 767 n. 11, 93 S.Ct. at 2340 n. 11. Finally, the lower court found, and the Supreme Court affirmed the finding, that because of the black community's exclusion from participation in the Democratic Party selection process, blacks had been generally excluded from entering the political process in any "reliable and meaningful manner." *Id.* at 767, 93 S.Ct. at 2340.

Similarly, in *Whitcomb v. Chavis*, the Supreme Court discussed slating in the context of the plaintiffs' ability to "participate in the political processes and to elect legislators of their choice." 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971). In *Whitcomb* the court found that the plaintiffs, inhabitants of the ghetto, had not been excluded from the political process because they had had the opportunity

to run for office on the Democratic ticket. The court found no evidence to support a conclusion that the plaintiffs "were regularly excluded from the slates of *both* major parties, thus denying them the chance of occupying legislative seats." *Id.* at 150, 91 S.Ct. at 1872 (emphasis added) (footnote omitted).

■■■■ Under *White* and *Whitcomb,* slating is offensive when it has the effect of excluding a minority from reliable and meaningful participation in the political process. The facts of this case do not support the conclusion that this type of slating has been employed in Norfolk City Council elections to the detriment of Norfolk blacks. The only two alleged incidents of slating did not even occur in consecutive elections. Plaintiffs have failed to bear their burden of establishing by the greater weight of the evidence that the alleged westside businessmen's group refused to include candidates on their ticket based on the candidates' race, or that they so dominate the political scene as to deny blacks access to the electoral process. And, significantly, there is no evidence before this Court which would support the conclusion that a westside businessmen's group controlled Norfolk City Council elections, or even had an inordinate amount of influence over who became members of City Council. On the contrary, the evidence, discussed above, supports a conclusion that election to Norfolk City Council is not dependent on or hindered by any alleged slating process.

Accordingly, this Court finds that plaintiffs have failed to prove the existence of a candidate slating organization which denies blacks access to that process.

9. Responsiveness to the Minority Community's Needs: The East Ghent Redevelopment

■■■ In its original opinion, this Court found no lack of responsiveness of Norfolk's officials to the needs of the black community, finding that Norfolk's black community is "well-represented on the more important boards and commissions" and that there is no evidence that minorities are under-represented in City employ-

ment. 605 F.Supp. at 394–95. This Court also found that the Libraries, Fire, Human Resources, Police, Health, Parks and Recreation, Public Works, Public Utilities, Community Improvement, Housing Services, Cemeteries and Public School Departments are all responsive to the needs of black citizens. *Id.* at 395–97. These findings were not disturbed on appeal.

This Court also found that, contrary to plaintiffs' allegations, the Norfolk Redevelopment and Housing Authority ("NRHA") had been responsive by replacing slum housing on a one-for-one basis with "decent, safe and sanitary housing." *Id.* at 397. This Court further found that NRHA had not violated federal law with regard to racial balance in public housing, that HUD regulations prevent the use of quotas to achieve racial balance, and that Norfolk is a well-integrated city. *Id.* at 398–99. On remand, the Fourth Circuit did not challenge this Court's findings on these housing issues. 816 F.2d at 939.

The only factual finding on responsiveness on which the Fourth Circuit requested clarification was the question of the relocation of black residents from the East Ghent slums. *Id.* This Court originally found that the decisions of the NRHA to relocate black families from East Ghent and to redevelop East Ghent to attract middle-income families were not racially motivated. 605 F.Supp. at 398. On remand from the Supreme Court, the Fourth Circuit held that this Court, instead, should determine whether these decisions were unresponsive to the needs of black families relocated from East Ghent, without regard to motive. 816 F.2d at 939. This Court now finds that these NRHA decisions not only lacked racial animus, but also were not unresponsive to the needs of the East Ghent black families.

All parties agree that prior to redevelopment, the East Ghent neighborhood, which was largely, if not entirely, occupied by blacks, was severely run down. NRHA director David Rice described the area as being:

... in very bad condition. Drainage was very bad. If an area was low, it flooded.

The sewer system was worn out and improperly built in the first place, and I would say the housing conditions were almost as bad as some of the earlier conditions in Norfolk after World War II. Tr. 1751. Rice went on to characterize the area as a "slum". *Id.* NRHA concluded that the housing conditions were so bad that redevelopment required that they demolish the existing housing rather than rehabilitate it. Tr. 1752. Accordingly, the approximately 1,800 families who had been occupying the East Ghent slum housing, the great majority of whom were black, were relocated to other public housing projects and private housing in Norfolk. Tr. 1739, 1741, 1757, 1790, 1818. In moving these families, NRHA complied with its procedures that families displaced by NRHA programs be moved to "decent, safe and sanitary housing." Tr. 1739–41. NRHA also complied with the requirements of the U.S. Department of Housing and Urban Development (HUD) that withdrawn low-income and moderate-income housing be replaced on a one-to-one basis with other low-income and moderate-income housing, Tr. 1741–42, 1754–55, and that persons displaced by HUD-funded projects be adequately relocated. Tr. [Riddick] 2921–22.

Plaintiffs contend, however, that NRHA was unresponsive to the needs of the East Ghent black families in failing to provide new low-income housing in East Ghent. There were indications at the beginning of redevelopment that such housing would be built in order to allow displaced families to move back to East Ghent. Tr. 1757–58. In fact, the first project built in the East Ghent redevelopment was 150 units of subsidized housing for the elderly. Tr. 1754. However, in 1974, a presidential moratorium on federal subsidies for private housing eliminated most of the HUD funds for the East Ghent redevelopment. Tr. 1753–54, 1762. At about that same time, NRHA decided to redevelop East Ghent so as to attract middle-income families back into downtown Norfolk. Tr. 1754. On the one hand, NRHA's decision was motivated by the need to broaden Norfolk's tax base. Tr. [Riddick] 2915, 2921. HUD concurred with Norfolk's assessment that its tax base needed to be strengthened. Tr. [Riddick] 2915. On the other hand, NRHA wanted to aid in rejuvenating Norfolk's downtown. Tr. 1763. Attracting middle-income families back into downtown Norfolk was consistent with good city planning and was considered by Rice to be a very important part of accomplishing the rejuvenation. Tr. 1763–64. Certainly, the East Ghent black families, as well as other Norfolk residents, were well served by a NRHA policy aimed at ensuring that public services were adequately provided, encouraging a higher quality of life, re-integrating the inner city area and providing more job opportunities. *See* Tr. [Riddick] 2915. East Ghent's zoning was changed to accommodate NRHA's redevelopment goals, but this zoning change did not prohibit later development of subsidized housing in East Ghent. Tr. 1755–56. Furthermore, the East Ghent development was open to all races. Tr. 1764–65 (Testimony of David H. Rice).

In light of these circumstances, the Court must conclude that the relocation of the East Ghent black families to other housing, and the subsequent redevelopment of East Ghent to attract middle-income families, was not unresponsive to the needs of the East Ghent black families.

## III. CONCLUSION

Plaintiffs' burden in establishing a Section 2 claim is to demonstrate that under the " 'totality of circumstances' ... the political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] ... in that its members have *less opportunity than other members of the electorate to participate* in the political process, *and to elect representatives of their* choice." 106 S.Ct. at 2763 (quoting S.Rep.) (emphasis added).

This determination must be based on "a searching, practical evaluation of the 'past and present reality,' and on a 'functional' view of the political process." *Id.* at 2764 (citations omitted). This reality is peculiarly dependent upon the facts of each case.

Having made such a searching, practical evaluation and considering the totality of the circumstances, this Court finds no Section 2 violation. The reality of Norfolk's electoral process is radically different from the reality of the North Carolina districts found to violate Section 2 in *Gingles.* Norfolk's strong black political organizations, consistent white cross-over voting, large candidate fields and the many other factors discussed above combine to give black citizens a strong voice in Norfolk's City government. While the plaintiffs personally have been unsuccessful when they have run for City office, this Court finds that this lack of success is due to their individual inability to attract a significant following among voters of either race, or to gain the support of Norfolk's black political leaders in their efforts. Their lack of success is not the result of vote dilution cognizable under Section 2 as interpreted in *Gingles.* This Court finds that Norfolk's black voters are usually successful in electing their preferred candidates; that there is no legally significant racial bloc voting in Norfolk, and that the success of black-preferred candidates in Norfolk is so nearly proportional to the black population as to preclude the change sought under Section 2 even if there were legally significant racial bloc voting.

This Court therefore finds that Norfolk's at-large system for the election of City Council members does not violate Section 2 of the Voting Rights Act, and judgment shall enter for the defendants.

IT IS SO ORDERED.